# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:04CR00056-016 |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **KENNETH JOSEPH STEPHENS**, | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

*Thomas J. Bondurant, Jr., and Jennifer R. Bockhorst, Assistant United States Attorneys, Roanoke and Abingdon, Virginia, for United States of America; Robert W. Ritchie and Stephen Ross Johnson, Ritchie, Fels & Dillard, P.C., Knoxville, Tennessee, for Defendant Kenneth Joseph Stephens.*

The defendant Kenneth Joseph Stephens has objected to the calculation of his guideline range for sentencing purposes. This opinion supplements the rulings of the court made at the conclusion of the hearing held on his objections.

In this prosecution, dubbed "Operation Big Coon Dog" by the government, sixteen defendants, including seven public officials or employees, have been convicted of federal offenses primarily arising out of a bribery and bid-rigging scheme to repair flood damage in Buchanan County, Virginia. As explained in the presentence investigation report ("PSR") prepared by a probation officer of this court, and uncontested by the defendant:

While there are several instances of corruption involved in the conduct of the defendants, the majority of the criminal conduct in this case began following the "Hurley Flood of 2002" and some minor floods which occurred in the spring of 2003. Hurley, a small community in Buchanan County, Virginia, lies within the Knox District and the supervisor during the time frame of the illegal conduct was Stuart Ray Blankenship.

After a series of heavy rains on May 2, 2002, Buchanan County was seriously flooded with damages totaling approximately 50 million dollars and the loss of two lives. The hardest hit area was near Hurley in the Knox district. This damage included the destruction of houses, businesses, roads and bridges. The subsequent cleanup work involved removing flood debris from the creeks so that they would not become obstructed and flood again; to rebuild damaged roads and bridges; and to demolish any unsafe structures.

Within days of the flood, the Federal Emergency Management Agency (FEMA) began working with the Virginia Department of Emergency Management (VDEM) to establish a public assistance program to reimburse Buchanan County for damages caused by the flood. The process calls for the county to initially pay the contractors and apply to VDEM for reimbursement for a particular project. If VDEM approves the project, the application is sent to FEMA for approval, if FEMA approves the project, the federal agency pays 75% of the cost to VDEM, who adds 23% of the cost and wires the funds to the county. The county is responsible for the final 2% of the cost, which was offset by a handling/management fee of 2% paid to the county. In relation to the Hurley flood its' agencies submitted 71 projects totaling approximately $5 million which was approved by VDEM and FEMA. The county disbursed an additional approximate amount of $2.1 million that has not yet been reimbursed by VDEM or FEMA. Therefore, the transactions involved in the instant offenses total approximately $7.1 million.

Initially FEMA and VDEM contracted with the Army Corps of Engineers, who subcontracted with Disaster Recovery Contractors (DRC) of New Orleans for debris removal from the creeks. County officials, led by Stuart Ray Blankenship, accused DRC of padding its

tonnage of debris removal by randomly digging and hauling off dirt and rocks, rather than removing destructive debris from the creeks. In addition, the county officials were upset that DRC was not hiring local contractors. By June 2002, FEMA agreed with the county, refused to pay DRC a $500,000 payment, and turned over cleanup operations to county officials. However, by the time DRC was relieved of duties on June 21, 2002, it had received payments of approximately $3.2 million.

After the county became authorized to award contracts for cleanup operations, bridge repairs, construction and demolition, FEMA approved project applications if they were "reasonable" and the process of awarding a contract "complied with state law." The county board of supervisors decided that the supervisor of each district could unilaterally award contracts in that district for emergency work and could accept low bids of three contractors/participants in non-emergency work. However, the distinction between emergency and non-emergency work was not clear. In addition, the bidding process was not open, as the supervisor could choose which three contractors were to bid on a certain project. This process opened the door to bribes and bid-rigging. Supervisor Stuart Ray Blankenship of the Knox district accepted cash, expensive coon dogs, the construction of a coon dog kennel, a dog box for his truck, a motor, motor vehicles, ATVs, clothing, food, vacations, and a firearm to influence the awarding of contracts. Supervisor James Ralph "Pete" Stiltner, Jr., of the Rock Lick district accepted cash, favorable land transactions, favorable equipment transactions, clothing and a large screen TV to entice the awarding of contracts and cover-up illegal activities. County Coal Road Engineer Kenneth Morris Hale accepted cash and assisted Stuart Ray Blankenship obtain a motor. County Emergency Coordinator David Mathias Thompson accepted cash and clothing for rendering aid in the awarding of contracts. FEMA employee Gary Ray Moore accepted cash, a firearm, NASCAR tickets, football tickets, tires and construction materials to induce FEMA to keep the flow of federal money unimpeded and to "look the other way." County Road Inspector Ricky Allen Adkins was allowed to submit falsified expense and time records because he fed the coon dogs and cleaned out the kennels belonging to Stuart Ray Blankenship, as well as mowing his lawn and bringing him lunch. The remaining defendants are

> the contractors who paid the bribes and rigged the bids. The specific details are as follows.
>
> On May 6, 2002, Stuart Ray Blankenship approached Kenneth Joseph Stephens and told him "the FEMA money is coming" and that Stephens will "make more money than you will ever see" if Blankenship's charge accounts at the Stephens' owned Vansant Lumber Store were forgiven. The Vansant Lumber ledger reflected that approximately $2,000 was removed from Blankenship's account. From this point on, Stephens paid a series of bribes totaling approximately $124,577.83 to Blankenship in order to receive Hurley flood contracts in the approximate amount of $2.28 million. The bribes include approximately $71,000 in cash that Stephens hand delivered to Blankenship from June 2002 until February 2003; Stephens purchased a $2,300 coon dog for Blankenship on December 10, 2003; a $5,500 coon dog on January 3, 2003; and a $5,000 coon dog on February 18, 2003. Stephens spent an unknown amount of money to construct a coon dog kennel for Blankenship during the summer of 2002 and used his VISA charge card to finance Blankenship's vacations to national coon dog hunting events in Duncan, Oklahoma, and Murray, Kentucky, in the amount of approximately $2,600. On September 25, 2002, Stephens bought Blankenship an ATV for approximately $6,800, and on December 31, 2002, Stephens bought Blankenship a $17,600 Ford Ranger pickup. Although Stephens kept the truck titled in his name for tax deductions purposes, Blankenship had full use of the truck and used it often for his coon dog activities. In May 2002, Blankenship requested that Stephens buy a motor for Blankenship's personal truck, and Stephens paid $2,014.76 for the motor. In January 2003, Stephens gave Blankenship a .38 caliber Smith and Wesson Bodyguard revolver, for which he paid approximately $500.

(PSR §§ 84-89.)

A multicount indictment was returned against the defendants on June 23, 2004. On September 2, 2004, defendant Stephens pleaded guilty to Count One, charging a

violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1962(c) (West 2000) and Count Twenty-Five, conspiracy to commit money laundering, 18 U.S.C.A. § 1956(h) (West Supp. 2005). The court accepted the defendant's plea and directed the preparation of a PSR. In the PSR, the probation officer determined that the defendant's offense level should be calculated pursuant to United States Sentencing Guidelines Manual ("USSG") § 2S1.1(a)(2) (2004), relating to money laundering, and using the total value of the laundered funds of $3.2 million. Calculated thus, the defendant's Base Offense Level is 26, together with an enhancement because of his conviction under 18 U.S.C.A. § 1956. *See* USSG § 2S1.1(b)(2)(B) (2004). His Total Offense Level is 28, and with a Criminal History Category of I, that translates into an imprisonment range of 78 to 97 months.

The defendant objects to the use of USSG § 2S1.1(a)(2) to calculate his offense level. He contends that his offense level should be determined using the 2002 guideline for bribery of a public official, USSG § 2C1.1 (2002).[1] According to him,

---

[1] The 2002 version of the Guidelines Manuel is suggested because the offense conduct here took place in 2002 prior to the effective date of the 2004 Manual and an increase in the applicable levels is contained in the latter version of this guideline. *See* USSG App. C, amend. 666 (Nov. 1, 2004). The version of the Guideline Manuel in effect as of the date of sentencing is to be used, unless it would violate the Ex Post Facto Clause. *See* USSG § 1B1.11(b)(1) (2004).

this would produce a Total Offense Level of 24, with a sentencing range of 51 to 63 months.

In *United States v. Booker,* 125 S.Ct. 738, 767 (2005), the Supreme Court held that the Sentencing Guidelines are not mandatory, although a sentencing court is still obligated to "consult those Guidelines and take them into account," along with the sentencing factors set forth in 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2005). Accordingly, at least in this circuit, a sentencing court must "first calculate (after making appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (citations omitted).

The parties agree that in order to calculate the proper offense level, the court must first look to the money laundering guideline, § 2S1.1. That guideline offers two successive alternatives in order to determine the Base Offense Level: (1) the offense level for the underlying offense from which the laundered funds were derived if the offense level for that offense can be determined; or otherwise (2) eight levels plus the number of offense levels from the theft, property destruction, and fraud table corresponding to the laundered funds. USSG § 2S1.1(a) (2004). The commentary

to this guideline provides that alternative (2) applies to any case in which "the offense level for the underlying offense is impossible or impracticable to determine." USSG § 2S1.1, cmt. n.3(A).

The underlying offenses for the defendant's money laundering conduct are bribery and wire fraud. The guidelines for both offenses require a determination of the loss to the government from the defendant's conduct. *See* USSG §§ 2B1.1(b) (2004), 2C1.1(b)(2) (2002). As shown by the evidence in this case, the loss to the government in this wide-ranging scheme cannot practically be determined. The bribery of those who accepted the bids for the work permitted the cost of the work to be essentially unregulated. Because of the nature of most of the work, it is now impracticable, if not impossible, to determine in hindsight what the work would have cost the government had the illegal and fraudulent bids not been accepted. There is ample evidence that the cost was excessive, but no realistic way to even estimate the excess.

For these reasons, it is **ORDERED** that the defendant's objection to the PSR is denied.[2]

---

[2] The government has moved for a downward departure from the guideline range based on the defendant's assistance in the prosecution. *See* USSG § 5K1.1 (2004). I have granted that motion, but I have not determined the appropriate extent of the departure.

- 7 -

Case 1:04-cr-00056-JPJ   Document 402   Filed 07/13/05   Page 7 of 8   Pageid#: 1426

ENTER: July 13, 2005

/s/ JAMES P. JONES
Chief United States District Judge